**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**HANNA BRANSON,**

**Plaintiff,**

**v.**

**Officer SARAH L. HOWARD, in her individual and official capacities,**

**and**

**CITY OF LEAVENWORTH, KANSAS,**

**Defendants.**

**Case No. 25-2330-DDC-ADM**

**MEMORANDUM AND ORDER**

A Leavenworth, Kansas police officer received a report of a dog bite on her patrol, so she set out to see what she could find. The officer encountered two dogs, who initially retreated from her. But they quickly reappeared and the officer—now on foot—followed them down an alley. The dogs entered some bushes, then quickly re-emerged. When they did so, the two dogs barked and trotted in the direction of the officer. She responded by dropping the catchpole she was holding, drawing her service weapon, and yelling for the dogs to stop. They didn't. So, the officer shot both dogs in the head.

The dogs' owner, plaintiff Hanna Branson, has sued the officer, Sarah L. Howard, along with Howard's employer, the City of Leavenworth. Branson claims the defendants have violated her constitutional rights and deprived her of other rights protected by Kansas state law. But defendants filed a motion to dismiss setting forth several reasons for why Branson fails to state

claims upon which the court can grant relief. Among other things, Howard asserts she's protected by qualified immunity.

The court concludes that Howard doesn't deserve qualified immunity, at least not at the motion-to-dismiss stage. It thus declines to dismiss Branson's constitutional claim against Howard. But the court agrees with defendants' other arguments, so it dismisses each of Branson's other claims. The remainder of this Order explains the reasons for these conclusions.

## I. Background

All the following facts come from those alleged in Branson's Complaint (Doc. 1), and Howard's body-camera footage (Doc. 15).[1] On September 10, 2024, defendant Sarah L. Howard shot and killed Georgia Peach and Bolt, dogs belonging to plaintiff Hanna Branson. *Id.* at 2–4 (Compl. ¶¶ 12, 15–16). Howard was a law enforcement officer employed by defendant City of Leavenworth, Kansas. *Id.* at 3 (Compl. ¶ 13). At approximately 5:53 p.m., Howard responded to a police dispatch about "two unconfined dogs who had allegedly bitten a person." *Id.* (Compl. ¶ 15). Then,

---

[1] Defendants attached footage from Howard's bodycam as an exhibit to their Motion to Dismiss. Doc. 15. Ordinarily, the court must evaluate the sufficiency of the complaint based on the pleadings alone, not other materials. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). But there are a few exceptions to this general rule. On a Rule 12(b)(6) motion, the court may consider: "(1) 'documents that the complaint incorporates by reference,' (2) 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,' and (3) 'matters of which a court may take judicial notice.'" *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) (quoting *Gee*, 627 F.3d at 1186).

The court concludes it must consider the video as part of this motion. In her Complaint, Branson alleges facts that only could have come from Howard's bodycam footage. She specifically references "the video," which is an evident reference to Howard's bodycam footage. Doc. 1 at 4 (Compl. ¶ 16). Defendants subsequently attached that video to their Motion to Dismiss, and Branson didn't object—instead, she cited the video as well. Doc. 16 at 3. Not only does the Complaint rely on and refer to the video, but the footage is "central" to Branson's claim—it's the critical evidence showing the event at issue. Especially now that Branson hasn't objected or disputed the video's authenticity, it's proper for the court to consider it. *See Martinez v. City of Aurora*, 174 F.4th 745, 750 n.2 (10th Cir. 2026) (proper to consider a document attached to a motion to dismiss where neither party challenged it).

> [a]t approximately 5:56 p.m., Officer Howard exited her patrol vehicle and opened the trunk to retrieve a catchpole. A few seconds later, she saw two dogs walking across the street and into an alleyway. The dogs' appearance indicated they were groomed, healthy weight, clean, and very clearly companion animals belonging to a caring person. The dogs had retreated into some brush in the alleyway close to their own home where they lived with Ms. Branson. Despite the dogs showing no aggression at any point in the video prior to the shooting, Defendant Howard radioed in, reported her location over her radio, and stated "the darker brown is aggressive, tried to approach me, haven't been able to catch either." Defendant Howard slowly followed the two dogs into the alley. At 5:57 p.m., Georgia Peach and Bolt emerged from the bushes, barked, and trotted in Officer Howard's direction. Officer Howard dropped her catch-pole, drew her weapon, said "stop!" and immediately, without waiting, fired four shots, two shots in each dog's head. At 5:58 p.m., both dogs lay dead.

*Id.* at 4 (Compl. ¶ 16). After the shooting, Howard investigated the dog-bite report and learned the individual allegedly bitten sustained minor injuries that didn't require medical attention. *Id.* (Compl. ¶ 17).

At no time during the encounter did the dogs show undue aggression toward Howard; they mostly avoided her. *Id.* (Compl. ¶ 18). The dogs "jogged" toward Howard while "displaying normal dog behavior"—after Howard "approached *them* with her weapon drawn." *Id.* (emphasis in original). Branson alleges that "Howard had no reasonable fear" of great bodily harm under the circumstances. *Id.* at 4–5 (Compl. ¶ 19). Branson also alleges that Howard acted unreasonably when she "failed to make a good faith attempt at using her catchpole or any other non-lethal means" to capture the two dogs. *Id.* at 5 (Compl. ¶ 19). Because Howard initially observed the duo as they "casually trotted away to their own yard," an officer reasonably could have believed the dogs "were capable of being captured by non-lethal means, but none were attempted." *Id.*

Branson claims the City of Leavenworth is also responsible for the death of her dogs because it failed to supervise and train officers adequately on animal control and capture. *Id.* (Compl. ¶ 20). Howard told Branson that the "City had ordinances and procedures for the safe

impoundment of lost or stray animals, [but] it neither trained [its] officers on these procedures nor put in place any mechanism for implementing them." *Id.* at 5–6 (Compl. ¶ 21). The City "was clearly aware of the need for animal control" and had municipal ordinances in place to deal with animal-related issues. *Id.* at 7 (Compl. ¶ 26). Despite the "non-existent" or at least "inadequate" training on animal control, the City "knew that its police officers would routinely be in a position of responding to calls and reports of stray animals." *Id.* at 12 (Compl. ¶¶ 52–53). Put altogether, Branson alleges the City was deliberately indifferent to officers "routinely violat[ing] the rights of individuals without fear of repercussion or sanction[.]" *Id.* (Compl. ¶¶ 52, 54).

Following the death of her dogs, Branson filed this lawsuit. It asserts claims against Howard and the City to recover money damages under 42 U.S.C. § 1983 and § 1988. Branson alleges she suffered and continues to suffer injuries due to these events—Howard's killing her dogs, and the City's failure to train Howard appropriately—including pain, mental anguish and distress, and anxiety. *Id.* at 12–13 (Compl. ¶ 56). In addition to her § 1983 claims, Branson asserts three claims under state tort law—conversion and/or trespass to chattels, reckless infliction of emotional distress, and negligence. *Id.* at 13–14 (Compl. ¶¶ 58–60).

Defendants filed a Motion to Dismiss advancing several defenses, including qualified immunity. *See* Doc. 11; Doc. 12. The court begins by explaining the applicable legal standard for a motion to dismiss. Then, it will evaluate defendants' objections to the § 1983 claims against Howard and the City, in that order. Finally, the court will analyze Branson's tort claims.

## II. Legal Standard

A party may move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a Rule 12(b)(6) motion to dismiss, it "must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion, the court must assume that factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

**III. § 1983 Claim against Howard**

Branson has sued Howard under 42 U.S.C. § 1983, which provides plaintiffs a vehicle to sue state officials for violating their constitutional rights. Specifically, Branson asserts that Howard violated her Fourth Amendment rights by unreasonably seizing her property—that is, by killing Georgia Peach and Bolt. Howard has raised a qualified immunity defense against the claim.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant has "asserted the defense of qualified immunity, the burden is on Plaintiffs to establish their right to

proceed." *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018); *see also Bledsoe v. Carreno*, 53 F.4th 589, 617 n.25 (10th Cir. 2022).

"Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "'Asserting a qualified immunity defense via a Rule 12(b)(6) motion, however, subjects the defendant to a more challenging standard of review than would apply on summary judgment.'" *Hemry v. Ross*, 62 F.4th 1248, 1253 (10th Cir. 2023) (quoting *Thomas*, 765 F.3d at 1194). Specifically, "[w]hen a defendant asserts qualified immunity at the motion to dismiss phase, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the [1] defendant[] plausibly violated their constitutional rights, and that [2] those rights were clearly established at the time.'" *Brown v. City of Tulsa*, 124 F.4th 1251, 1265 (10th Cir. 2025) (alterations in original) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008)). If the plaintiff fails to carry her burden to show either a constitutional violation or a clearly established right, then "'the defendant prevails on the defense'" and the plaintiff's "claims are dismissed." *Losee v. Preece*, 2022 WL 957194, at *5 (D. Utah Mar. 30, 2022) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016)).

Now, the court decides whether Branson plausibly alleges Howard has violated her Fourth Amendment rights, and if so, whether those rights were "clearly established."

**A. Violation of the Fourth Amendment**

The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" The killing of a pet animal, such as a dog, is considered an unlawful seizure of property under the Fourth Amendment "'absent a warrant or some exception to the warrant requirement.'" *Love v. Grashorn*, 134 F.4th 1109, 1114 (10th Cir. 2025) (quoting *Mayfield v.

*Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016)). Every circuit to address the issue agrees. *See Bethards*, 826 F.3d at 1256; *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (noting that "[e]very circuit that has considered the issue" of a police officer shooting a dog agrees that the killing constitutes a Fourth Amendment seizure); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016) (similar).

There's an exception for exigent circumstances—for example, when "an aggressive dog poses an immediate threat" to an officer. *Love*, 134 F.4th at 1118. The Tenth Circuit has held that "the availability of qualified immunity turns on the existence of an imminent danger to" law enforcement officers. *Id.* When assessing the reasonableness of deadly force, the Circuit "assign[s] greatest importance to the threat of serious physical harm to the officer or others." *Id.* at 1118 n.8. Most circuits, including ours, "'have invariably concluded that the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable.'" *Id.* at 1116 (quoting *Robinson v. Pezzat*, 818 F.3d 1, 7 (D.C. Cir. 2016)). Whether the officers acted under a reasonable fear of danger depends on the "totality of the circumstances." *Id.* at 1118 n.8. These cases often involve nuanced factual inquiries, as the court outlines in the next few paragraphs.

In *Love*, the Tenth Circuit affirmed a ruling denying summary judgment where an officer shot a dog who had run toward the officer while he was responding to a report about a truck in a parking lot after hours. *Id.* at 1111, 1119. The dog was "a few feet away" when the officer fired. *Id.* at 1111. The court declined to disturb the lower court's conclusions that a jury could find that the dog "posed no immediate danger," the officer "had time to consider non-lethal options," and the plaintiffs possibly could have controlled the dog. *Id.* at 1114. On those facts, the Circuit

held a reasonable jury could conclude the officer had seized the plaintiffs' dog unreasonably, violating the Fourth Amendment. *Id.* at 1116.

In *Mayfield v. Bethards*, the Mayfields alleged that two officers fired on their dogs as they lay in the front yard of the family home. 826 F.3d at 1254. The shots killed one of the dogs. *Id.* Plaintiffs stated a witness had observed the officers shooting the dogs even though "neither dog acted aggressively[.]" *Id.* The district court denied the officers' request for qualified immunity at the motion-to-dismiss stage. *Id.* And the Tenth Circuit affirmed, finding that it could "infer that killing [the dog] was not a reasonable seizure." *Id.* at 1258. Our Circuit acknowledged that the qualified immunity question often turns out differently at different stages of litigation: While the officers "could present evidence that might succeed at summary judgment or trial, at the motion-to-dismiss stage our review is limited to the sufficiency of the allegations in the Complaint." *Id.*

The story of the Mayfields and their dogs is particularly instructive here. After the district court denied the motion to dismiss, the parties completed discovery, and a different factual narrative emerged. *Mayfield v. Harvey Cnty. Sheriff's Dep't*, 732 F. App'x 685 (10th Cir. 2018). The case returned to the Tenth Circuit on a second appeal of the qualified immunity question, but this time as decided at summary judgment. *Id.* There was uncontradicted testimony that the dog "charged" the officers, then later "snarled, showed her teeth, barked at the officers in an aggressive manner, and attacked them again." *Id.* at 690–91 (quotation cleaned up). With no evidence contradicting the dog's aggressive behavior, the district court granted qualified immunity to the defendants at summary judgment. *Id.* at 691. The Tenth Circuit affirmed that ruling, holding that a reasonable officer under the circumstances could conclude the dog had "posed an imminent threat and the use of deadly force was unavoidable." *Id.* The two

Mayfield opinions demonstrate the importance of the governing procedural standard. On the motion to dismiss, the issue was whether the complaint's allegations—if true—could support a Fourth Amendment claim; at summary judgment, the issue was whether a reasonable jury could find the claim has merit based on the summary judgment evidence. *Id.*

The weight of authority in dog-shooting cases suggests that where the dog at issue hasn't shown any sign of aggression, the plaintiff likely will prevail at the motion-to-dismiss stage. This outcome is even more likely when the alleged facts plead that nonlethal alternatives were available to the officer. *Love*, 134 F.4th at 1118. In sum, courts generally deny qualified immunity when the complaint contains no allegations that the dogs were aggressive or dangerous (on motions to dismiss), or where the uncontradicted facts show the dogs weren't dangerous (at summary judgment). *See Bethards*, 826 F.3d at 1254 (qualified immunity denied at motion-to-dismiss stage because complaint didn't allege danger); *LeMay v. Mays*, 18 F.4th 283, 287–88 (8th Cir. 2021) (refusing to grant qualified immunity at motion-to-dismiss stage where officer shot dog who approached while wagging tail); *Love*, F.4th at 1118 (qualified immunity denied at summary judgment because facts established absence of danger). And qualified immunity is generally granted only when the governing facts show that the dog acted aggressively or displayed violent tendencies. *See Harvey Cnty.*, 732 F. App'x at 690–91 (summary judgment granted where dog behaved aggressively and attacked); *Kendall v. Olsen*, 727 F. App'x 970, 974 (10th Cir. 2018) (summary judgment granted where large dog pursued officer while barking loudly and baring teeth); *Bewley v. City of Duncan*, 149 F.3d 1190, 1998 WL 314382, at *1 (10th Cir. 1998) (summary judgment granted where unrestrained dog charged, lunged, and growled at officers and bared its teeth at pedestrians); *Helms v. Gamet*, 828 F. Supp. 819, 821 (D. Colo. 1993) (summary judgment granted where dog charged officer "with teeth bared and hackles

raised”); *Brown*, 844 F.3d at 562–63 (summary judgment granted where dogs barked aggressively, lunged, and jumped); *Altman v. City of High Point*, 330 F.3d 194, 206 (4th Cir. 2003) (reversing district court decision denying summary judgment where the dogs roamed at large, attacked several people in neighborhood, and exhibited aggressive behavior).

Here, Branson’s Complaint alleges facts establishing that her dogs acted the way dogs normally do when Howard encountered them, exhibiting no signs of aggression. Doc. 1 at 4 (Compl. ¶¶ 16, 18). After walking into their own yard, the dogs “barked, and trotted” toward Howard as she approached them. *Id.* (Compl. ¶ 16). Although Howard was holding a catchpole, she immediately dropped it and pulled her firearm instead, firing “immediately, without waiting[.]” *Id.* Branson alleges that the dogs didn’t “show any undue aggression” at any point in their encounter with Howard, meaning they barked and were moving around the way dogs ordinarily do. *Id.* (Compl. ¶ 18).

For these reasons, the court concludes that Branson has stated a plausible Fourth Amendment claim. It’s possible to infer that Howard’s shooting of the dogs wasn’t a product of a reasonable fear of imminent danger where the dogs had displayed no aggressive behavior. *Id.* Defendants haven’t directed the court to any case holding that an officer reasonably feared danger merely from a dog approaching (and even getting up close) when there weren’t any additional signs suggesting danger. *Love*, 134 F.4th at 1116 (denying qualified immunity when dog approaching officer was just a few feet away).

Moreover, a report of a dog bite in the area, standing alone, isn’t enough to conclude that Branson has failed to state a claim that Howard acted unreasonably. A dog running “at large” unrestrained by its owner is a factor that might support a finding of dangerousness, but the cases granting qualified immunity at summary judgment in such situations also included direct

evidence of the dog's aggressive behavior. *See Bewley*, 1998 WL 314382, at *1 (unconfined dog attacked people, exhibited signs of agitation, and bared its teeth at officers). Additionally, Howard had nonlethal options available to her—namely, her catchpole—which supports an inference of unreasonableness. *See Love*, 134 F.4th at 1116. In other instances where qualified immunity protected a police officer, the officer had attempted to retreat, *Kendall*, 727 F. App'x at 974, or tried nonlethal means first, *Bewley*, 1998 WL 314382, at *1 (attempted to capture dog with catchpole before resorting to tranquilizer gun). Here, Branson alleges Howard didn't utilize nonlethal alternatives available to her, plausibly alleging that Howard's conduct was unreasonable.

To be sure, Howard did remove the catchpole from her patrol car in an attempt to capture one or both dogs. Doc. 1 at 4 (Compl. ¶ 16). But Howard *chose* to approach the dogs, on foot, right after reporting on her radio that one dog had been aggressive. *Id.* While approaching, Howard dropped the catchpole and "immediately" fired her gun without taking a step back or otherwise attempting to retreat. *Id.* Under our Circuit's precedent, these facts state a viable Fourth Amendment claim. The Tenth Circuit commented in *Love* that it "hesitate[s] to tell district courts how to decide whether a dog poses an imminent threat." 134 F.4th at 1118 n.8. Likewise, this court hesitates to determine at the pleading stage that no reasonable jury could possibly infer that Howard acted unreasonably in shooting Branson's dogs. A jury reasonably could find that Howard didn't face imminent danger because the dogs weren't acting aggressively and she didn't make meaningful attempts to retreat or use the catchpole.

Defendants counter, arguing that the facts captured by the bodycam footage paint a picture of imminent dangerousness to Howard that made her actions reasonable.[2] Doc. 12 at 6.

---

[2] Defendants correctly note that the court can't rely on two facts alleged in the Complaint. The court can't consider that Howard later discovered (1) the reported bite wasn't serious, and (2) the dogs

Defendants characterize the dogs' approach of Howard as "charging," *id.*, while Branson characterizes it as "trotting" (Doc. 1 at 4 (Compl. ¶ 16)). After careful review of the bodycam footage, the court is convinced that a reasonable jury could find from the Complaint's allegations and the video that the dogs approached Howard with some amount of speed, but such a jury could also find that the dogs didn't manifest any signs of aggression. *See* Doc. 15. Although reasonable minds could disagree whether Branson's description of their approach as "trotting" is apt, the exact swiftness of the dogs' pace isn't decisive here. The facts in the Complaint (as well as what's shown in the video footage) don't contradict Branson's allegation that the dogs displayed no aggressive behavior during their encounter with Howard. *Id.* Even if the court determined that the dogs were moving much faster than a trot, the video doesn't "depict[] the dogs' behavior leading up to the shootings in a manner entirely inconsistent from the allegations in the complaint." *LeMay*, 18 F.4th at 289. So, "dismissal at this stage" is at least "premature." *Id.* at 290.

The rub in this case is whether Howard acted under a reasonable fear of imminent danger from Branson's dogs. "The existence of an immediate danger is an issue of fact, not law." *Love*, 134 F.4th at 1112 (citing *Clerkley v. Holcomb*, 121 F.4th 1359, 1364 (10th Cir. 2024)). On a motion to dismiss, all Branson must do is plausibly allege facts that could permit a reasonable jury to conclude the dogs posed no imminent danger to Howard, or that the danger was reasonably avoidable. She's met that burden. The fact that a dog bite was reported in the area and Branson's dogs approached Howard isn't enough to establish imminent danger precluding

---

were located outside Branson's home. Howard only learned these things after the shooting occurred. Doc. 18 at 1. The court doesn't rely on these facts in its qualified immunity analysis because the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer . . . rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

any possibility that Branson could prevail. Thus she's stated a plausible constitutional violation of her Fourth Amendment rights.

Next, the court turns to whether Branson has stated a violation of clearly established law.

**B. Clearly Established Law**

To satisfy the second prong of the qualified immunity analysis, Branson must state facts constituting a violation of a "clearly established" constitutional right. A right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotation cleaned up). The lawfulness of the officer's conduct must be "'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). A plaintiff can't defeat qualified immunity "simply by alleging violation of extremely abstract rights," *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotation cleaned up), and a court shouldn't "define clearly established law at a high level of generality," *Ashcroft*, 563 U.S. at 742. "Ordinarily, to make such a showing of clearly established law in our circuit, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts[.]" *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (quotation cleaned up). "But a factually similar case isn't always required," and "a right may be clearly established when case law applies 'with obvious clarity.'" *Love*, 134 F.4th at 1116 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

Branson cites *Love*, 134 F.4th 1109 and *Bethards*, 826 F.3d 1252, among other cases, to illustrate that her claim is one based upon a "clearly established" right. Doc. 16 at 4. *Bethards* held that the officers had adequate notice that the "'killing of a companion dog constitutes a seizure within the meaning of the Fourth Amendment.'" 826 F.3d at 1259 (quoting *Viilo*, 547 F.3d at 710). And *Love* held, with a greater degree of specificity, that a "clearly established"

violation of the Fourth Amendment occurs when an officer shoots a pet dog that "poses no immediate danger." 134 F.4th at 1116. As the court already discussed at length, *see above* § III.A, the facts alleged by Branson are sufficiently analogous to those in *Love* to state a claim under our Circuit's precedent.

The court thus concludes that Branson's claim is one recognized by clearly established law. Like in *Love*, Branson asserts facts indicating the dogs weren't aggressive and that Howard didn't meaningfully try to apply nonlethal means before shooting. Doc. 1 at 4 (Compl. ¶ 16). If proven at trial, those allegations are enough to violate clearly established law, as *Love* plainly held. To hold otherwise would allow law enforcement officers to enjoy qualified immunity for killing any dog they encounter within the vicinity of a reported dog-bite incident so long as that dog approaches the officer. Both "common sense" and the Tenth Circuit's clearly established precedent make it plain that this isn't the law. *Love*, 134 F.4th at 1117.

Defendants argue that the Complaint doesn't allege a violation of clearly established law because the Fourth Amendment doesn't "prohibit[] officers from shooting dogs that the officer *reasonably* believe[d] pose[d] an imminent threat." Doc. 12 at 8 (emphasis added). But that argument merely states defendants' legal conclusion, and it has no bearing on the court's analysis of what Branson's Complaint plausibly alleges. Branson alleges facts suggesting Howard unreasonably believed her dogs posed a threat, and that Branson's dogs in fact posed no imminent threat to Howard's safety. Doc. 1 at 4 (Compl. ¶ 18). For purposes of this motion, the court must assume Branson's factual allegations are true—so, the question is whether it's "clearly established" that Howard acted unreasonably when she shot dogs that didn't pose a genuine, imminent threat. The court concludes Branson has alleged facts that could show

Howard violated clearly established law. The court therefore will deny defendants' Motion to Dismiss Branson's § 1983 claim against Howard.

Next, the court turns to Branson's § 1983 claim against the City.

## IV. § 1983 Claim against City of Leavenworth

42 U.S.C. § 1983 authorizes claimants to sue municipalities for violations of their constitutional rights. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). To "establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993). A municipal policy or custom can take many forms: (1) a "formal regulation or policy statement"; (2) an informal custom that is "so permanent and well settled as to constitute a custom or usage with the force of law"; (3) decisions by employees with "final policymaking authority"; (4) ratification by final policymakers of decisions made by subordinates with delegated authority; and (5) a "failure to adequately train or supervise employees[.]" *Bryson*, 627 F.3d at 788 (quotation cleaned up). Here, Branson opts to rely on the final option, claiming that the City of Leavenworth is liable because it failed to train or supervise its law enforcement officers adequately about proper animal control procedures. Doc. 1 at 5 (Compl. ¶ 20).

Municipal liability based on a failure to train or supervise employees exists only under "limited circumstances" where the "municipality's failure to train its employees in a relevant respect . . . amount[s] to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation cleaned up). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* To establish deliberate indifference—a component of the failure-to-train standard—the plaintiff ordinarily must allege a "pattern of similar constitutional

violations by untrained employees[.]" *Id.* at 62. Without such a pattern, deliberate indifference is found only in a "'narrow range of circumstances'" where the alleged constitutional violation is "'a highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction[.]" *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998) (quoting *Bd. of Cnty. Commn'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

Branson alleges here that it "appears" the City engaged in "no or almost no training, supervision, or discipline of its officers when it comes to animal capture, less lethal capture tactics and tools, or lethal force continuums." Doc. 1 at 5 (Compl. ¶ 20). Howard allegedly told Branson that the City didn't train its officers on animal control procedures. *Id.* at 5–6 (Compl. ¶ 21). Branson asserts the City acted with deliberate indifference because it knew its failure to train and supervise its officers "would result in the unlawful killings and deaths of family pets," and, knowing this, it still didn't act to train its officers properly. *Id.* at 12 (Compl. ¶ 54). She also alleges that officers in the City "routinely" respond to reports of stray animals and "routinely violate the rights of individuals[.]" *Id.* (Compl. ¶¶ 52–53).

Branson's allegation that the City consciously knew its failure to train would produce constitutional violations by its officers is insufficiently vague and conclusory. The court will accept her assertion that the City failed to train its officers on implementation of its animal control ordinances. *Id.* at 5–6 (Compl. ¶¶ 20–21). But Branson must also allege facts showing the City was on notice that its officers' training was constitutionally "deficient" in some "particular respect[.]" *Connick*, 563 U.S. at 62. Branson could do so, for example, by showing that policymakers continued to adhere "'to an approach that they know or should know has failed to prevent tortious conduct by employees[.]'" *Id.* (quoting *Bryan*, 520 U.S. at 407). Yet Branson's Complaint lacks any non-conclusory allegations showing that (1) there was a pattern

of unlawful shootings of pet animals or (2) the City was on notice that its officers routinely had engaged in alleged unlawful shootings.

Branson claims vaguely that officers in the City have "routinely" committed unlawful shootings of family pets (Doc. 1 at 12 (Compl. ¶ 52)), but fails to allege any specific facts showing a "pattern of similar constitutional violations" actually existed, *Connick*, 563 U.S. at 62, or that even a single other instance of an unlawful dog-shooting had occurred. Defendants pounce on Branson's failure to allege any pattern of officers shooting dogs. Doc. 12 at 11. They're correct. The absence of any other incidents renders Branson's allegations implausible and conclusory in nature. *Compare Dempsey v. City of Rochester*, 2020 WL 7047493, at *8 (W.D.N.Y. Nov. 30, 2020) (municipal liability is supported where the plaintiff established that the city had statistically high rates of dog shootings indicating town had a "shoot-first" policy). Beyond her blithe assertions that officers in the City regularly handle reports of stray animals and then commit unconstitutional shootings, she hasn't stated enough "factual content to nudge" her claim to the level of "plausible" instead of merely "conceivable." *Iqbal*, 556 U.S. at 683 (quotation cleaned up).

Without a plausible pattern, Branson must find some other way to demonstrate that the City was deliberately indifferent. But equally conclusory are Branson's claims that the City was on notice of routine constitutional violations rising to the level of deliberate indifference. Branson states the existence of municipal ordinances about animal control indicates the City knew that stray animals were a frequently recurring problem. Doc. 1 at 7 (Compl. ¶ 26). True, perhaps, but Branson alleges no facts that allow the additional inference needed—that the City not only knew its officers frequently would deal with stray animals and pet animals, but that it also knew its training on these issues was constitutionally deficient. *Connick*, 563 U.S. at 62.

Branson's allegations show that the City knew about the problem of stray animals, but she never alleges particular facts demonstrating that the City knew its employees improperly—and unconstitutionally—handled the problem due to their poor training.

Without alleging facts that could establish a pattern of unconstitutional behavior (or that even one other unconstitutional act had occurred), Branson hasn't alleged a plausible claim that the City was consciously aware of unconstitutional actions by its officers related to animal control. And she hasn't stated plausibly that the City knew its training program was constitutionally deficient, meaning she hasn't established facts supporting an inference of deliberate indifference by the City. So, the court grants defendants' Motion to Dismiss the § 1983 claim against the City.

## V. Branson's Tort Claims

Defendants next argue that Branson's tort claims—conversion and/or trespass to chattels, reckless infliction of emotional distress, and negligence—fail for a variety of reasons. One of those arguments asserts that the Kansas Tort Claims Act (KTCA) bars Branson's tort claims. Doc. 12 at 22–25. The court need only address their argument about the KTCA's discretionary-function immunity.

The KTCA created a general waiver of state sovereign immunity, *Youngblood v. Qualls*, 308 F. Supp. 3d 1184, 1206 (D. Kan. 2018), and declared governmental entities in Kansas "shall be liable" for negligent or wrongful acts committed by its employees acting within the scope of their employment, *Schreiner v. Hodge*, 504 P.3d 410, 423–24 (Kan. 2022) (quoting Kan. Stat. Ann. § 75-6103(a)). But the KTCA included several exceptions to the Act's waiver of immunity. One of those exceptions precludes liability for discretionary functions:

> (a) A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

> . . .
>
> (5) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved[.]

Kan. Stat. Ann. § 75-6104. The governmental entity bears the burden of establishing immunity. *Schreiner*, 504 P.3d at 423.

Whether an employee's conduct was "a discretionary function" within the meaning of § 75-6104(a)(5) turns on the "nature and quality" of the discretion exercised, and it applies only to acts involving "an element of judgment or choice." *Id.* at 423–24 (quotation cleaned up) (analyzing § 75-6104(e), which contained identical language to § 75-6104(a)(5) as amended). The Supreme Court of Kansas has held that "an officer's determination whether reasonable suspicion exists is an inherently discretionary process," and that "the investigatory methods and procedures employed by governmental employees [are] matters requiring the exercise of judgment and discretion." *Id.* at 424. Investigating a report of criminal activity—including investigating a "potential threat to public safety"—involves the kind of "policy-based judgments the [Kansas] Legislature intended to insulate from tort liability" under § 75-6104(a)(5). *Id.* at 425–26.

Here, defendants assert that the KTCA bars all of Branson's state-law tort claims because Howard's conduct constituted a "discretionary function" for which Branson can't hold the City and Howard liable. Doc. 12 at 23. Howard was a law enforcement officer for the City acting within the scope of her employment when she committed the alleged wrongful acts described in the Complaint. Doc. 1 at 2, 3 (Compl. ¶¶ 7, 15).

Branson makes but one argument in response: She argues the court can't consider defendants' discretionary immunity defense because it goes to the court's subject matter

jurisdiction, making it improper to consider in defendants' Motion to Dismiss under Rule 12(b)(6). Doc. 16 at 6–7. She's mistaken. Yes, an assertion of sovereign immunity bars the court's jurisdiction to hear a case, and so the court must consider it under Rule 12(b)(1). *Davis v. California*, 2017 WL 4758928, at *1 (D. Kan. Oct. 20, 2017), *aff'd*, 734 F. App'x 560 (10th Cir. 2018). But the court has discretion to construe defendants' immunity arguments as a motion to dismiss under Rule 12(b)(1), even though the motion itself states it's brought under Rule 12(b)(6). *Id.*

Branson cites *Brown v. United States*, which held that a district court was "procedurally incorrect" to apply Rule 12(b)(6) to the defendant's jurisdictional arguments brought under Rule 12(b)(1). 151 F.3d 800, 803 (8th Cir. 1998).[3] *Brown* doesn't carry the day because the court here is doing the opposite: treating defendants' jurisdictional argument as one brought under Rule 12(b)(1). The court thus concludes that defendants' immunity argument is appropriately considered as part of their Motion to Dismiss and will apply Rule 12(b)(1) to their jurisdictional argument and Rule 12(b)(6) to all others.

In her Response to this aspect of defendants' motion, Branson didn't make any other arguments against defendants' assertion of sovereign immunity—she put all her eggs in one basket. By doing so, she waived the opportunity to raise other reasons for denying defendants' motion on this front. *United States v. Cervini*, 379 F.3d 987, 994 n.5 (10th Cir. 2004) ("Arguments not raised by the parties in their briefs are deemed waived."). And the court can't supply objections of its own. *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (Courts "call balls and strikes; they don't get a turn at bat." (quotation cleaned up)). Concluding that Kan. Stat. Ann.

---

[3] In *Brown*, this procedural snag didn't change the outcome. The Eight Circuit affirmed. 151 F.3d at 807.

§ 75-6104(a)(5) bars Branson's state tort claims against both defendants, the court grants defendants' Motion to Dismiss Branson's tort claims.[4]

## VI. Conclusion

Branson claims the killing of her dogs was the product of unconstitutional conduct by Howard and the City of Leavenworth. The court grants defendants' Motion to Dismiss Branson's tort claims and the § 1983 claim against the City. The court declines to dismiss Branson's § 1983 claim against Howard. Branson states a plausible claim for relief that the shooting of her dogs constituted an unreasonable seizure under clearly established Fourth Amendment law. She thus will have a chance to go forward on that claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Sarah L. Howard and the City of Leavenworth's Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim (Doc. 11) is **GRANTED IN PART** and **DENIED IN PART**. The Motion to Dismiss plaintiff's claim against defendant Sarah L. Howard under 42 U.S.C. § 1983 is denied. Plaintiff's claim against defendant City of Leavenworth, Kansas under 42 U.S.C. § 1983 is dismissed without prejudice. Plaintiff's claims under Kansas law against both defendants are dismissed without prejudice.

**Dated this 29th day of September, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

[4] When a district court dismisses a case on grounds of state sovereign immunity, the dismissal is due to lack of jurisdiction under Rule 12(b)(1). *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006). The court must impose such dismissals as ones without prejudice. *Id.*; *Davis*, 734 F. App'x at 562 & 562 n.3 (dismissal based on state sovereign immunity is jurisdictional and without prejudice); *see also* Fed. R. Civ. P. 41(b) (noting that dismissal for lack of jurisdiction is not an adjudication on the merits).